920 F.2d 651
 59 USLW 2404, 19 Fed.R.Serv.3d 49,
13 Employee Benefits Ca 1001
 Clair B. PRATT, Plaintiff-Appellee,
v.
PETROLEUM PRODUCTION MANAGEMENT, INC. EMPLOYEE SAVINGS PLAN
& TRUST, et al., Defendants-Appellants,
Petroleum Production Management, Inc., Administrator;
Reuben R. Paulsen, Trustee; and Frank E. Novy,
Trustee, Defendants.
 No. 88-2190.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 29, 1990.
 
 Timothy B. Mustaine (James M. Armstrong, with him on the brief), Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for plaintiff-appellee.
 Neil S. Sader (Thomas C. Brown, with him on the brief), Brown & Thiessen, P.C., Kansas City, Mo., for defendants-appellants.
 Before BALDOCK, BARRETT and EBEL, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 Plaintiff-appellee Clair B. Pratt brought this action against his employer's Employee Retirement Income Security Act (ERISA) pension plan, the plan's administrator (the corporate employer), and the plan's two trustees, alleging that the defendants used an improper valuation date when assessing the value of his vested interest in the Employer Contribution Account funded by employer securities.[1] Plaintiff sought judgment on three ERISA claims: 1) breach of contract against the plan, 29 U.S.C. Sec. 1132(a)(1)(B), 2) breach of fiduciary duty by the three plan fiduciaries (the corporate administrator and individual trustees), 29 U.S.C. Secs. 1109 & 1132(a)(2), and 3) attorney's fees against all defendants, 29 U.S.C. Sec. 1132(g)(1). See rec. vol. II, doc. 16 at 12-14.
 
 I.
 
 2
 Plaintiff was terminated from his employment with the defendant company on February 28, 1986 due to a reduction in force. Under the terms of the plan, when he was terminated he was entitled to receive a "distribution of his vested interest in his Employer Contribution Account valued as of the Valuation Date next preceding the date of his separation from service." Plan Sec. 7.5, rec. vol. II, doc. 16, ex. A. The "Valuation Date" is defined as "the date on which the Trust Fund shall be valued and Accounts adjusted accordingly, which date shall be the last day of each Plan Year with respect to Employer securities and the last day of each month with respect to all other securities." Id. Sec. 2.24. In turn, the "Plan Year" is defined as "the 12 month period beginning on October 1 and ending on September 30 of each year." Id. Sec. 2.18(c).
 
 
 3
 Plaintiff separated from his employment on February 28, 1986. For the employer securities at issue, the valuation date next preceding plaintiff's separation was September 30, 1985, the last day of the plan year. On the valuation date of September 30, 1985, plaintiff's share in employer securities totaled $27,692.32. Between the valuation date and plaintiff's separation, however, the value of the plan's employer securities declined markedly. This resulted in several actions by the defendants.
 
 
 4
 First, on April 25, 1986, some eight weeks after plaintiff's separation, the plan was amended (retroactive to October 1, 1985) to include provisions which redefined the "Valuation Date" to "include any date that an Interim Evaluation Accounts is performed in accordance with [new] section 6.11." Amended Plan Sec. 2.24, rec. vol. I, doc. 14, ex. 1 (amend. no. 1), infra n. 13. New Sec. 6.11, which lacked a counterpart in the original plan, allowed for interim valuation when "necessary to account for a material change in the fair market value of the Fund." Amended Plan Sec. 6.11, rec. vol. I, doc. 14, ex. 1 (amend. no. 1), infra n. 12. Second, defendants ordered an interim valuation of the plan assets as of January 31, 1986, and determined that plaintiff's share in employer securities totaled $7,184.37, not $27,692.32. Defendants now claim Plan Sec. 11.8,[2] constitutes authority for the revaluation. Third, on November 26, 1986, the defendants formally denied the plaintiff's request for valuation in accordance with the original plan, expressly relying upon amended Sec. 2.24 and new Sec. 6.11 and claiming that these provisions were "in force for the year of ... termination."
 
 
 5
 The parties filed cross-motions for summary judgment. After a hearing,[3] the district court determined that the relevant plan provisions in effect at the date of plaintiff's separation were unambiguous and clearly resulted in a valuation date of September 30, 1985. The court rejected defendants' contention that Plan Sec. 11.8 allowed an interim valuation date and adjustment of the accounts. Attaching significance to defendants' failure to cite Sec. 11.8 when denying benefits, the court noted that Sec. 2.24 defining "Valuation Date" did not reference Sec. 11.8 and concluded that the more-specific language of Sec. 7.5 controlled. The court decided that, while various Plan amendments might allow interim valuation, such amendments should not be applied retroactively because to do so would violate ERISA Sec. 204(g)(1) which provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. Sec. 1054(g)(1).[4]
 
 
 6
 The district court also decided that the defendant trustees had breached their fiduciary duty in applying the plan amendments retroactively to the plaintiff and revaluing his interest in the employer securities. According to the court, the defendants' actions "were arbitrary, capricious or based upon a mistake of law." Finally, plaintiff was awarded attorney's fees and costs apparently based upon the factors in Gordon v. United States Steel Corp., 724 F.2d 106, 109 (10th Cir.1983). The same day as the memorandum and order was entered, the district court entered a judgment granting plaintiff's motion for summary judgment and awarding "costs and attorney fees as detailed in [the] order."
 
 II.
 
 7
 Before addressing the merits of the appeal, we must settle a few matters pertaining to our jurisdiction.[5] The notice of the appeal in this case provided:Clair B. Pratt,
 
 
 8
 Plaintiff,
 
 
 9
 vs.
 
 
 10
 Petroleum Production Management, Inc., Employee Savings Plan and Trust, et al.,
 
 
 11
 Defendants.
 
 
 12
 Notice is hereby given that Petroleum Production Management, Inc., Employee Savings Plan and Trust et al., defendants above named, hereby appeal....
 
 
 13
 Fed.R.App.P. 3(c) requires that the notice of appeal "shall specify the party or parties taking the appeal." In Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988), the Supreme Court affirmed a Ninth Circuit holding that " '[u]nless a party is named in the notice of appeal, the appellate court does not have jurisdiction over him.' " Id. at 314, 108 S.Ct. at 2407 (quoting unreported decision). "The failure to name a party in a notice of appeal ... constitutes a failure of that party to appeal." Id. The Court specifically rejected the argument "that the use of 'et al.' in the notice of appeal [is] sufficient to indicate [a party's] intention to appeal." Id. at 317, 108 S.Ct. at 2409. "The specificity requirement of Rule 3(c) is met only by some designation that gives fair notice of the specific individual or entity seeking to appeal." Id. at 318, 108 S.Ct. at 2409.
 
 
 14
 Torres requires "strict compliance" with the naming requirement of Rule 3(c) because the filing of a proper notice of appeal is mandatory and jurisdictional. Woosley v. Concorde Resources (In Re Woosley), 855 F.2d 687, 688 (10th Cir.1988). A "harmless error" analysis does not apply given "the nature of a jurisdictional requirement: a litigant's failure to clear a jurisdictional hurdle can never be 'harmless' or waived by a court." Torres, 487 U.S. at 317 n. 3, 108 S.Ct. at 2409 n. 3. We recently rejected an argument similar to the one made by defendants, that because the body of the notice of appeal contains the term "defendants," the notice should be deemed to include all of the defendants. In Laidley v. McClain, 914 F.2d 1386 (10th Cir.1990), only one of four plaintiffs was named in the notice of appeal and the caption also contained the troublesome "et al." designation. Id. at 1388 n. 1. In dismissing the appeals of the three unnamed plaintiffs for lack of jurisdiction, we said:
 
 
 15
 Although a statement that "plaintiffs hereby appeal," when combined with an "et al." designation to some of the plaintiffs, could be interpreted to mean that all of the plaintiffs intend to appeal, it could also be understood as designating less than all of the plaintiffs as appellants. Clearly, the specificity requirement of Rule 3(c) was intended to eliminate ambiguity as to the identity of the appellants. (citations omitted). Thus, the failure to specifically designate a party somewhere in the notice of appeal is a jurisdictional bar to that party's appeal.
 
 
 16
 Id. at 1389. We see no reason why the rationale of Laidley should not apply to this case which turns on the adequacy of the defendants' "et al." designation in the caption of the notice of appeal combined with the phrase "defendants above named, hereby appeal" contained in the body. Only the plan has appealed; the remaining defendants must be dismissed from the appeal for lack of jurisdiction.
 
 
 17
 Defendants urge us to follow Ford v. Nicks, 866 F.2d 865 (6th Cir.1989), which held that an "et al." designation in the caption combined with the phrase "defendants' [sic] appeal" in the body of the notice of appeal was sufficient to encompass the unnamed defendants. Unfortunately for defendants, the Sixth Circuit subsequently and en banc determined that Ford was inconsistent with Torres; naming the parties to the appeal is essential. See Minority Employees v. Tennessee Dep't of Employment Sec., 901 F.2d 1327, 1335 (6th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 210, 112 L.Ed.2d 170 (1990). In this circuit's most comprehensive analysis of Torres, we relied heavily on Minority Employees, indicating our agreement with the Sixth Circuit's more recent approach which specifically rejects Ford and requires naming. Laidley, 914 F.2d at 1389. We also relied upon Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 317 (1st Cir.1990) (en banc) which requires naming the parties to meet the specificity requirements of Fed.R.App. 3(c) in accord with the Supreme Court's decision in Torres. Laidley, 914 F.2d at 1389.
 
 III.
 
 18
 Defendants also suggest that because the judgment in this case is no more specific than the notice of appeal concerning the identity of the defendants, any judgment against the three unnamed defendants should not be allowed to stand. According to the defendants,
 
 
 19
 [s]ince Torres refuses to allow all four of the defendants to appeal because the notice of appeal designated three of them by the term "et al.," it is totally inequitable and nonsensical to allow a lower court judgment against those same three defendants designated by the term "et al." to stand. Elementary logic requires judgments to be more specific than notices of appeal.
 
 
 20
 Rehearing Petition at 11 (filed Aug. 23, 1989).
 
 
 21
 The judgment in this case is actually less specific concerning the identity of the parties than the notice of appeal because the judgment only references the defendants by "The Maurice L. Brown Co. et al." The Maurice L. Brown Co. is the corporate employer under a previous name. The district court previously had entered an order changing all references in the caption of the case to the renamed corporate employer, rec. vol. III at 17, however, subsequent court orders incorrectly captioned the case using the old corporate name. Specifically, the judgment references the district court's memorandum and order granting plaintiff summary judgment, which names of all the defendants, but retains the old corporate name.
 
 
 22
 The clerical errors contained in the judgment do not render it invalid. Defendants readily concede that "a change of name on the judgment is of no major consequence and can easily be accomplished" through Fed.R.Civ.P. 60(a). Apart from that, however, the practical question of the enforceability of the judgment in its present form is a different matter than the jurisdictional question presented by the notice of appeal. Merely because the judgment is in need of clerical correction does not give us license to disregard it, nor does it excuse defendants' noncompliance with the naming requirement of Fed.R.App.P. 3(c).
 
 
 23
 Building on the mistakes contained in the judgment, defendants urge that it is not final and we should remand this case for entry of a final judgment from which they would undoubtedly file a proper notice of appeal. They suggest that the district court's form of judgment is insufficient under Fed.R.Civ.P. 58 because it incorporates another document, namely the memorandum and order of the district court which contains the amounts. The purpose of the separate document requirement of Rule 58 is to clarify when the time for appeal begins to run. Banker's Trust Co. v. Mallis, 435 U.S. 381, 384, 98 S.Ct. 1117, 1119, 55 L.Ed.2d 357 (1978) (per curiam). Parties can waive strict compliance with the separate judgment rule. Id. at 386-87, 98 S.Ct. at 1120-21. And where the parties are not misled into believing an order non-final, the lack of technical compliance with Rule 58 will not preclude appellate review of that order. Laidley, 914 F.2d at 1390.
 
 
 24
 Here, all parties proceeded as though the judgment filed June 30, 1988 was final, notwithstanding that resort to the court's memorandum and order was necessary to quantify the judgment. The judgment was clearly entered on the docket by the clerk, and the docket entry referenced the court's memorandum and order. See Fed.R.Civ.P. 79(a); 6A J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice p 58.02 (1990) (distinguishing between entry, recordation and filing of judgment). Eight days after judgment, defendants moved the court for an additional twenty days in which to file a Fed.R.Civ. 59(e) motion to reconsider. The district court recognized that it was without jurisdiction to extend the ten-day time period contained in Rule 59(e), Brock v. Citizens Bank, 841 F.2d 344, 347-48 (10th Cir.1988), and warned the defendants that the time period for taking an appeal had not been tolled. Rec. vol. III, doc. 29 at 2. Thereafter, and within the thirty-day time period allowed by Fed.R.App.P. 4(a)(1), the defendants filed their notice of appeal. A transcript order form was filed and defendants posted a $58,000 supersedeas bond.
 
 
 25
 As we have noted, supra n. 5, the district court's omission of prejudgment interest in its judgment plainly was a clerical error which in no way affects the finality of the judgment. Defendants urge that the district court's intent was to award prejudgment interest as sought by plaintiff's complaint. We agree. See Rehearing Petition at 9; rec. vol. I, doc. 1 at 5 (complaint seeking prejudgment interest). Relying upon Garcia v. Burlington N. R.R. Co., 818 F.2d 713, 721 (10th Cir.1987) and Kaszuk v. Bakery & Confectionery Union, 791 F.2d 548, 553 (7th Cir.1986) (cited in Garcia ), defendants claim that if interest is to be awarded, a judgment is not final until such an award is made.
 
 
 26
 In Garcia, the district court decided the issue of prejudgment interest after entry of judgment and after a notice of appeal had been filed. 818 F.2d at 720. The district court sua sponte amended plaintiff's judgment to include prejudgment interest. Id. We recognized that prejudgment interest was not a collateral matter, instead it was part of the primary relief sought. Id. at 721. Thus, we held that the district court lost jurisdiction to award prejudgment interest, the plaintiff having failed to seek reconsideration of the damage award and the district court having failed to reserve the issue. Id. at 721-22. This case stands in marked contrast to Garcia; here, the district court expressly decided the issue of prejudgment interest in plaintiff's favor, but inadvertently omitted the amount from the judgment. See rec. vol. IV at 4. For the same reason, this case is distinguishable from Kaszuk.
 
 
 27
 In Kaszuk, the district court entered a Fed.R.Civ.P. 54(b) certification on the issue of liability, but failed to resolve one of the elements of damages requested, namely prejudgment interest. 791 F.2d at 552-53. The Seventh Circuit relied upon Liberty Mutual Ins. Co. v. Wetzel, 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976), for the proposition that "[a] decision that fixes liability but not damages is not appealable, despite the entry of an order under Rule 54(b)." Kaszuk, 791 F.2d at 553. Then the court decided that "no material difference" exists "between an order that leaves all damages issues open (as in Liberty Mutual ) and an order that leaves one, important damages issue open (this case). In either event, the order is not a final disposition of a claim and does not meet the standards of Rule 54(b)." Kaszuk, 791 F.2d at 553. Whatever the merits of Kaszuk in the Rule 54(b) context, it plainly was not followed in Garcia, which involved an appeal under 28 U.S.C. Sec. 1291. Garcia, 818 F.2d at 714. The Garcia court referred to the district court decision which awarded damages, and did not resolve the prejudgment issue, as a "final order," and decided the appeal on the merits. Id. at 721-22.
 
 
 28
 Though the judgment in this case referenced another order and inadvertently omitted prejudgment interest, it is final. The district court and the parties have treated it as such and we have jurisdiction to review it. See 6A Moore's Federal Practice, pp 58.02.1, 60.06; Aviles v. Lutz, 887 F.2d 1046, 1047-48 n. 1 (10th Cir.1989); Kunkel v. Continental Cas. Co., 866 F.2d 1269, 1272 n. 3 (10th Cir.1989). Defendants' notice of appeal from that judgment plainly was insufficient as to the corporate plan administrator and the individual trustees; only the plan has perfected an appeal.[6] Thus, we dismiss the appeals of the corporate plan administrator and the two individual trustees consider only those issues which affect the plan's liability under the judgment.
 
 IV.
 
 29
 The plan appeals contending that the plaintiff's vested benefit determined as of September 30, 1985 in accordance with the valuation procedure as it existed prior to amendment is not an accrued benefit. The plan also contends that interim valuation was permissible (via Sec. 11.8) prior to the plan amendment expressly providing for such valuation. In the alternative, the plan contends that the amendments (amended Sec. 2.24 and new Sec. 6.11) adopted subsequent to plaintiff's separation, but made retroactive, provide the authority for interim valuation. Reminding us of the fiduciary responsibilities of its administering agents, the plan suggests that the interpretation by these agents is not arbitrary and capricious and is designed to protect financial integrity of participant accounts given the decline in the value of the employer securities. Finally, the plan contends that it should have been awarded attorney's fees, not the plaintiff, and further that an absence of bad faith and benefit to all plan members should preclude an award of attorney fees being satisfied from plan assets.
 
 
 30
 Although only the plan is before us, its interpretation is performed in the first instance by its fiduciaries.[7] The fiduciaries are required to administer the plan "solely in the interest of the participants and beneficiaries." 29 U.S.C. Sec. 1104(a)(1). The fiduciaries are required to interpret "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. In reviewing fiduciary benefit decisions, we have repeatedly held that such decisions are to be upheld unless " '(1) arbitrary and capricious, (2) not supported by substantial evidence, or (3) erroneous on a question of law.' " Sage v. Automation Inc. Pension Plan & Trust, 845 F.2d 885, 895 (10th Cir.1988) (quoting Peckham v. Board of Trustees, 653 F.2d 424, 426 (10th Cir.1981)); Torix v. Ball Corp., 862 F.2d 1428, 1429 (10th Cir.1988); Carter v. Central States, SE & SW Areas Pension Plan, 656 F.2d 575, 576 (10th Cir.1981).
 
 
 31
 The Supreme Court has now held that in an ERISA breach of contract action, "a denial of benefits ... is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (emphasis added). Under a de novo standard, we would ask not whether the fiduciaries' interpretation of the contract was arbitrary and capricious, but only whether it was correct. More deference is paid to the fiduciaries' decision under the arbitrary and capricious standard. Here, an administrative committee is given power to construe and interpret the plan and that committee may seek guidance from others. See supra n. 7. Courts have divided concerning whether similar generic language empowers a fiduciary with discretion "to construe disputed or doubtful terms," see Bruch, 489 U.S. at 111, 109 S.Ct. at 954, or merely serves to identify a particular fiduciary responsible for general plan interpretation. Compare de Nobel v. Vitro Corp., 885 F.2d 1180, 1186-87 (4th Cir.1989) (language constitutes grant of discretion); Curtis v. Noel, 877 F.2d 159, 161 (1st Cir.1989) (same); Guy v. S.E. Iron Workers' Welfare Fund, 877 F.2d 37, 39 (11th Cir.1989) (same); Lowry v. Bankers Life & Cas. Retirement Plan, 871 F.2d 522, 524 (5th Cir.) (same), cert. denied, --- U.S. ----, 110 S.Ct. 152, 107 L.Ed.2d 111 (1989), with Baxter v. Lynn, 886 F.2d 182, 187-88 (8th Cir.1989) (language does not constitute a grant of discretion); International Bhd. v. Southern Cal. Edison Co., 880 F.2d 104, 108 (9th Cir.1989) (same); see also Sisters v. Swedishamerican Group Health Benefit Trust, 901 F.2d 1369, 1370 (7th Cir.1990) (discussing split). We are persuaded as a matter of law that the grant in this plan carries with it not only the authority, but also the discretion, to decide questions of plan interpretation. See Conference of Teamsters Retirement Plan, 898 F.2d 424, 427, reh'g en banc granted, (4th Cir. Apr. 17, 1990); Moon v. American Home Assur. Co., 888 F.2d 86, 88-89 (11th Cir.1989); Lowry, 871 F.2d at 525 n. 5.
 
 
 32
 Having determined the proper level of deference to be paid the fiduciaries' interpretation of the plan, our review of the various legal determinations made by the district court is plenary. Its decision whether to award attorney fees is reviewed for an abuse of discretion. 29 U.S.C. Sec. 1132(g); Gordon, 724 F.2d at 108, see also Anderson v. Emergency Medicine Assocs., 860 F.2d 987, 992 (10th Cir.1988); Sage, 845 F.2d at 895-96.
 
 
 33
 Defendant contends that for plaintiff to prevail, "he must be able to prove to the court that his accrued benefit under the plan guaranteed him the cash amount reflected on each yearly valuation of the plan assets (i.e., a cash sum as opposed to a unit sum)." Appellant's Brief at 11. According to the defendant, as of the date of termination, the plaintiff did not have an accrued benefit based upon the annual valuation of the accounts because such valuation was merely an accounting summary. Defendant also suggests that the plan before or after amendment provides justification for interim valuation. The district court determined that the plan was liable on two independent grounds: reduction of an accrued benefit under ERISA and breach of contract. We agree with the district court.
 
 
 34
 Plaintiff sought relief under ERISA Sec. 502(a)(1)(B),[8] a statutory provision allowing an ERISA " 'breach of contract' action[ ]." 29 U.S.C. Sec. 1132(a)(1)(B); O'Reilly v. Ceuleers, 912 F.2d 1383, 1387 (11th Cir.1990); see also Straub v. Western Union Tel. Co., 851 F.2d 1262, 1264 (10th Cir.1988) (state-law breach of contract claims preempted). This is a defined contribution plan, also known as an individual account plan. Such plans have two criteria: a separate account for each participant and measurement of benefits based solely on the level of funds or assets in each participant account. 29 U.S.C. Sec. 1002(34); Concord Control, Inc. v. International Union, United States Auto., Aerospace & Agric. Implement Workers, 647 F.2d 701, 705 (6th Cir.), cert. denied, 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981); Pension Benefit Guar. Corp. v. Defoe (In re Defoe Ship Bldg. Co.), 639 F.2d 311, 313 (6th Cir.1981); Connolly v. Pension Benefit Guar. Corp., 581 F.2d 729, 733 (9th Cir.1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). An "eligible individual account plan" may hold significant amounts of employer securities. Fink v. National Sav. & Trust Co., 772 F.2d 951, 955-56 (D.C.Cir.1985). A participant's accrued benefit in an individual account plan consists of the account balance which reflects the monetary value of contributions, income and expenses, and gains and losses allocated to the account. 29 U.S.C. Sec. 1002(23) & (34).
 
 
 35
 The plan specifically stated that when the plaintiff separated he was entitled to receive a "distribution of his vested interest in his Employer Contribution Account valued as of the Valuation Date next preceding the date of his separation from service." Plan Sec. 7.5.[9] Section 7.5 plainly sets out that a separating employee's vested interest shall be valued "as of the Valuation Date next preceding the date of [the participant's] separation from service." Id. The "Valuation Date" is defined as "the date on which the Trust Fund shall be valued and Accounts adjusted accordingly, which date shall be the last day of each Plan Year with respect to Employer Securities and the last day of the month with respect to all other securities." Id. Sec. 2.24. Contrary to defendant's position, the valuation date in these circumstances has more significance than merely to tally "the plaintiff's number of units" and his proportionate share of the plan assets. See Appellant's Brief at 13-15. At the valuation date, the accounts, including the Employer Contribution Account established for the plaintiff,[10] are "adjusted to reflect the effect of income received and accrued, realized and unrealized gains and losses, expenses and all other transactions." Id. Sec. 6.4. Should a participant then separate from employment, valuation of his vested interest already will have been accomplished in large part and distribution may then proceed. Id. Sec. 7.5.
 
 
 36
 The plan operated on a fiscal year, October 1 to September 30. Id. Sec. 2.18(c). Plaintiff separated from his employment on February 28, 1986. The last day of the plan year next preceding February 28, 1986 is September 30, 1985. Plaintiff's entitlement to benefits valued as of September 30, 1985 ($27,692.32) based on the plan as it existed on February 28, 1986, the date of separation, is clear based upon express language. Like the district court, we reject the notion that under Sec. 11.8, supra n. 2, a general plan provision allowing the plan trustee to determine the book and market values of the Trust Fund annually or "at such other times as are agreed upon with the Company," takes precedence over Sec. 7.5 which provides a mandatory and specific date for valuation when an employee separates. Section 7.5 states: "The Participant shall be entitled to a distribution of his vested interest in his Employer Contribution Account, valued as of the Valuation Date next preceding the date of his separation from service, increased by any Employer contributions attributable to him and any adjustment of account pursuant to Section 6.4 following such Valuation Date." (emphasis added). Thus, a correct interpretation results in valuation date of September 30, 1985.
 
 
 37
 Defendant's contention that Sec. 11.8 somehow modifies Secs. 7.5 and 2.24 to allow for interim valuation dates is not only incorrect, but also unreasonable. First, Sec. 11.8 allows for valuation of the trust fund,[11] not the particular member accounts. There is a difference. Compare Plan Sec. 2.23 (defining "Trust Fund") with Sec. 2.16 (defining "Participant Accounts") & Sec. 2.1 (defining "Accounts"). When the drafters wanted to refer to both the trust fund and the particular member accounts, they did so. See Plan Sec. 2.24. Second, the definition of valuation date contained in Sec. 2.24 nowhere references Sec. 11.8 or discusses interim valuation dates; when Sec. 2.24 was amended to provide for interim valuation it referenced not Sec. 11.8, but rather a new provision (Sec. 6.11) specifically allowing for interim valuation of accounts. Indeed, when the defendants denied plaintiff's claim for benefits, they did not reference Sec. 11.8, but rather relied upon new Sec. 6.11 and amended Sec. 2.24 providing for interim valuations. Third, Sec. 11.8, by its terms, does not provide authority to adjust participant accounts, which must occur prior to distribution. See New Sec. 6.11 p 3. Finally, Sec. 11.8 provides for book and market values, obviously, book value has little to do with the market value necessary for the payment of benefits. While Sec. 11.8 may provide for valuations needed for plan maintenance, it does not override the specific benefit provisions of the plan. See Plan Sec. 7.1, 7.3 & 7.5.
 
 
 38
 Nor can defendants reasonably rely upon new Sec. 6.11[12] and amended Sec. 2.24[13] to accomplish an interim valuation date. These retroactive amendments were made some eight weeks after the defendant separated and serve to reduce plaintiff's accrued benefit under the plan contrary to ERISA Sec. 204(g)(1). 29 U.S.C. Sec. 1054(g)(1). As a matter of ERISA contract law, these amendments cannot operate unilaterally to reduce plaintiff's accrued benefit.
 
 
 39
 Plaintiff relies upon Denzer v. Purofied Down Products Corp. Profit-Sharing & Retirement Plan, 474 F.Supp. 773 (S.D.N.Y.1979), which presents similar facts. The plan provided that after ten or more years, a participant would receive one-hundred percent of the balance of his account in the event of separation without cause. Id. at 774. In January 1978, Purofied terminated the plaintiff's sixteen-year employment without cause. Id. at 774-75. Purofied refused to distribute the plaintiff's benefits until he reached sixty-five, relying upon a plan amendment, adopted six months after plaintiff's separation and purportedly retroactive to September 1976. Id. at 775. Plaintiff brought an ERISA breach of contract action against the employer, the plan and the trustee alleging, inter alia, "that the amended Plan cannot be applied retroactively to deprive him of a right which vested in him under the old Plan, i.e., the right to receive benefits upon termination of employment without cause." Id. The district court agreed, reasoning that the plan "was an offer of a unilateral contract by Purofied to the plaintiff." Id. at 776. Once the plaintiff performed the conditions of that offer, the pension benefits vested and a binding unilateral contract existed which could not be modified without the plaintiff's consent. Id. "Thus alteration of the plaintiff's vested rights by retroactive amendment, without the plaintiff's consent, is ineffective." Id.
 
 
 40
 In Morales v. Plaxall, Inc., 541 F.Supp. 1387 (E.D.N.Y.1982), plaintiff was employed from March 1965 until he was terminated in July 1977. Id. at 1389. The plan adopted an amendment in 1976 which allowed for payment of benefits upon termination as opposed to reaching the age of sixty-five. Subsequent to the plaintiff's termination, the plan was modified to eliminate this early-payment option. Id. at 1389. The district court determined that the 1976 amendment was effective and, because it contained an expansion of the employee's rights, did not need the consent of the employee. Id. at 1391. The 1976 version of the plan, effective as of the date of the employee's termination, controlled and the early-payment option was available. Id.
 
 
 41
 We agree with the reasoning of Purofied and Plaxall. A "pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years." Hurd v. Illinois Bell Tel. Co., 234 F.2d 942, 946 (7th Cir.), cert. denied, 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 (1956); accord Hoefel v. Atlas Tack Corp., 581 F.2d 1, 4-5 (1st Cir.1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). When plaintiff was terminated, defendant was required to determine benefits in accordance with the plan then in effect. See Brug v. Pension Plan, 669 F.2d 570, 575-76 (9th Cir.), cert. denied, 459 U.S. 861, 103 S.Ct. 135, 74 L.Ed.2d 116 (1982); Danti v. Lewis, 312 F.2d 345, 349 (D.C.Cir.1962); Plaxall, 541 F.Supp. at 1391; Denzer, 474 F.Supp. at 766. Subsequent unilateral adoption of an amendment which is then used to defeat or diminish the plaintiff's fully vested rights under the governing plan document is not only ineffective, but also arbitrary and capricious. See Brug, 669 F.2d at 574-76; Danti, 312 F.2d at 348-49; Denzer, 474 F.Supp. at 766. Application of the retroactive amendment in these circumstances also is precluded by ERISA Sec. 204(g); only under carefully limited circumstances, see 29 U.S.C. Sec. 1082(c)(8), is an amendment permitted which would reduce an accrued benefit. See 29 U.S.C. Sec. 1054(g)(1); Meagher v. IAM Pension Plan, 856 F.2d 1418, 1420-21 (9th Cir.1988).
 
 
 42
 Of course, the difficulty with the plan in existence at the time of plaintiff's termination is that the valuation of the plaintiff's interest in employer securities did not reflect the current market value because it relied upon market value determined in the past. In a declining market, this constitutes a burden to the plan, however, in a rising market the plan (not the separating employee) would benefit from this feature because the employee would receive only historical market value, not the higher current market value. We are not free to rewrite the plan to reallocate that risk. Moreover, plausible reasons exist for the valuation method originally selected; perhaps a stable or rising market was expected or perhaps the expense of obtaining more frequent valuations for these employer securities was considered too great.[14]
 
 
 43
 When a plan is silent or ambiguous and the result reached by the plan acting through its fiduciaries is not foreclosed by law, we will uphold the result. Crouch v. Mo-Kan Iron Workers Welfare Fund, 740 F.2d 805, 808 (10th Cir.1984). But here the plan document unambiguously addresses the valuation procedure, hence, the plan is contractually bound to honor that procedure as it existed when the plaintiff separated. While we are sensitive to the obligations of the plan's fiduciaries and the theoretically negative effect on other plan members,[15] it would not be proper for the court in this instance to modify judicially the terms of the plan.[16] That task falls to the plan's administrator and trustees, and we note that the plan now has been amended to provide for interim valuation.
 
 
 44
 Two cases relied upon by the defendant consider valuation and distribution in a declining market and reach different results than we do, but these cases are distinguishable. In Bachelder v. Communications Satellite Corp., 837 F.2d 519 (1st Cir.1988), the First Circuit considered the import of a summary plan description (SPD) which indicated that, once entitled to benefits, the plaintiffs would receive a cash distribution based upon the market value of publicly-traded stock held by the plan. Id. at 520. Plaintiffs received a lesser amount because, when the stock was sold several weeks later, the price per share had declined. The Bachelder court made the legal determination that the SPD was ambiguous and the language and structure of the plan precluded an immediate cash distribution. Id. at 522. In an alternative holding, the court announced that the plaintiffs failed to show reliance or prejudice flowing from the SPD, a secondary plan document. Id. at 521-22. In the absence of a specific provision governing "the date upon which shares of stock are to be converted into cash," id. at 520, the court looked to the plan's "apparent purposes, its structure and its history." Id. at 522. The court determined that specific shares of stock had to be sold to avoid the "risk of disbursing funds from shares allotted to other participants" which could expose the "fiduciaries to allegations of breach of fiduciary duties." Id. No dispute existed concerning the reasonableness of the six-to-eight week delay to accomplish the administrative task of apportioning the shares and selling them. Id. at 521 n. 4.
 
 
 45
 In this case, we do not have a plaintiff relying upon a secondary plan document, a descriptive brochure. Rather, plaintiff merely is insisting that the terms of the original plan document be enforced. We will not require detrimental reliance before enforcing actual, express contractual provisions that admit only of a single interpretation. Here, unlike Bachelder, the plan is not silent concerning a valuation date; we are without license to alter an express, unambiguous provision, even though that provision results in one participant receiving an amount greater than the appraised value of the employer securities immediately prior to separation.
 
 
 46
 Defendant also relies upon Cator v. Herrgott & Wilson, Inc., 609 F.Supp. 12 (N.D.Cal.1984), which involved enactment of a plan amendment providing for interim valuations. The district court noted the salutary purpose of a provision allowing for interim valuation: "to provide ... the 'necessary flexibility' to minimize the detrimental impact of fluctuating market conditions on the Plan's assets." Id. at 14. Recognizing the duty of plan fiduciaries to participants and beneficiaries, the district court determined that the interim valuation amendment, enacted one month prior to the plaintiff's retirement, was not arbitrary and capricious.
 
 
 47
 Cator did not include one of the operative facts in this case: application of a retroactive amendment to defeat or diminish an eligible member's vested benefits. Thus, Cator is distinguishable. The Cator district court recognized that the plan amendment "took effect before Cator retired and, therefore, was not applied retroactively to divest him of eligibility for benefits." Id. at 16. It distinguished Brug v. Pension Plan, 669 F.2d 570, a Ninth Circuit case following the accepted rule that application of retroactive amendment may not work to defeat or diminish vested benefits as of the date of eligibility. Cator, 609 F.Supp. at 16.
 
 
 48
 Defendant's last two arguments on this point may be handled with dispatch. Defendant argues that because the Internal Revenue Service (IRS) determined that the plan amendments did not disqualify the plan from favorable tax treatment, this means that the plan amendments could not have decreased the plaintiff's accrued benefit. See I.R.C. Sec. 411(d)(6). Nothing in this record, however, indicates that the IRS considered the specific facts and issues that we decide today. Given that fact, defendant's reliance upon the IRS decision concerning the amendments is misplaced. See Sage, 845 F.2d at 894 n. 4 (rejecting argument that IRS decision, which contained no discussion of the issue before the court, constrains a district court decision). Likewise, defendant refers us to Treas.Reg. Sec. 1.411(d)-4(A-1)(d)(8) (1988) which indicates that "valuation dates for account balances" are not "protected benefits" under I.R.C. Sec. 411(d)(6). Section 411(d)(6) generally provides that a plan will not qualify for favorable tax treatment if an accrued benefit is eliminated or reduced. For those plan members not yet separated, we agree that plan valuation dates may be changed by amendment because they are not protected benefits. However, the regulation does not address the problem in this case: retroactive amendment of plan valuation dates which causes an impermissible reduction in an extant benefit amount upon separation. Accordingly, the applicability of the regulation to the specific facts of this case is doubtful.
 
 V.
 
 49
 The district court awarded attorney's fees as against all defendants. See 29 U.S.C. Sec. 1132(g)(1). Previously the district court had determined that the plan administrator and trustees had breached their fiduciary duty by attempting to apply a retroactive amendment (which would reduce an accrued benefit) to the plaintiff and by repeatedly insisting that plaintiff sign a release from liability contrary to ERISA Sec. 410. See 29 U.S.C. Sec. 1110(a).[17] Defendant concedes that had the plaintiff signed the release, it would have been void. Appellant's Brief at 38-39. Our review of the record in this case convinces us that the district court did not abuse its discretion in deciding to award attorney's fees.
 
 
 50
 However, we must reverse the attorney's fee award (only as against the plan) and remand for further findings because the district court did not explain, nor is it apparent from the record, why it chose to award attorney's fees as against the plan, as well as against the other defendants personally. The award of attorney's fees as against the fiduciaries is not at issue in this appeal given our holding on the jurisdictional issue. In Eaves v. Penn, 587 F.2d 453, 464-65 (10th Cir.1978), we faced a similar situation and determined that a remand was appropriate when we could not determine from the record the extent to which the district court had considered the following factors in deciding whether attorney's fees should be absorbed by the plan or the breaching fiduciaries:
 
 
 51
 (1) the degree of the offending parties' culpability or bad faith; (2) the degree of the ability of the offending parties to satisfy an award of attorney fees; (3) whether or not an award of attorneys fees against the offending parties would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties position.
 
 
 52
 Id. at 465. The district court should consider these factors vis-a-vis the plan's liability for an award of attorney's fees. On remand, the district court should also correct the clerical errors in the judgment consistent with this opinion.
 
 
 53
 DISMISSED IN PART, AFFIRMED IN PART, REVERSED IN PART and REMANDED.
 
 
 
 [1]
 The Plan consisted of two parts: an Employee Contribution Account and an Employer Contribution Account. Plaintiff does not dispute the amount he received based upon his vested interest in the Employee Contribution Account
 
 
 [2]
 Section 11.8 is part of the Plan's general trust provisions and provides:
 Valuation of Trust Fund. The Trustee shall determine the book and market values of the Trust Fund annually as of close of business on the last day of each Plan Year and at such other times as are agreed upon with the Company. Such values shall be the book and market values of the securities in the Trust Fund, plus cash, interest, dividends, and other sums received and accrued but not yet invested. The market value of the securities in the Trust Fund shall be based upon such market quotations and other information as are available to the Trustee and as may in the Trustee's discretion be appropriate.
 
 
 [3]
 Only a small portion of the hearing was transcribed and placed in the record on appeal by the defendants
 
 
 [4]
 For "individual account plans," the term "accrued benefit" is defined as "the balance in the individual's account." 29 U.S.C. Secs. 1002(23) & (34). The plan defines the term as follows: " 'Accrued Benefit' of a Participant on any date means the balance in his Accounts under the Plan...." Plan Sec. 2.2
 
 
 [5]
 A motions panel of this court determined that we lacked jurisdiction over all of the defendants except the plan because it was the only party named in the notice of appeal. The motions panel also determined that the district court's judgment, though silent on the matter of prejudgment interest, constituted a denial of prejudgment interest, and was final for purposes of 28 U.S.C. Sec. 1291. Not before the motions panel was a partial transcript of the summary judgment hearing in which the district court announced its decision to award prejudgment interest
 Defendants sought rehearing on various grounds and the motions panel granted rehearing and referred the jurisdictional issues to the merits panel. We conclude that the original disposition of the jurisdictional issues by the motions panel was correct, with one minor amendment. On this record, no dispute ever existed concerning the plaintiff's right to prejudgment interest on the amount awarded. Indeed, the defendants suggest that the total amount in controversy in this appeal is the difference between the two valuations "plus pre and post judgment interest and attorney fees as ordered." Appellants' Brief at 10. This is not a case where the court's intentions concerning prejudgment interest are unclear, thus taking the issue beyond the terms of Fed.R.Civ.P. 60(a), which allows the district court to correct clerical mistakes in judgments arising from omission. "It is of course possible that the failure to include interest may result from a clerical error, and such would be the case where the judgment failed to reflect the actual intention of the court." 6A J. Moore, J. Lucas & G. Grotheer, Jr., Moore's Federal Practice, p 60.06; see also Hegger v. Green, 91 F.R.D. 595, 597 (S.D.N.Y.1981) (district court oversight in failing to direct the award of prejudgment interest may be corrected under Rule 60(a)). On remand, the district court shall correct its clerical error and include prejudgment interest in an amended judgment. Fed.R.Civ.P. 60(a).
 
 
 [6]
 In Brown v. Palmer, 915 F.2d 1435, 1439-40 (10th Cir.1990), reh'g en banc granted on other grounds, (10th Cir. Nov. 6, 1990), a panel of this court determined that the following notice was sufficient under Rule 3(c) to perfect an appeal by the United States:
 JOAN BROWN, et al.,
 Plaintiff-appellees,
 v.
 COLONEL JAMES O. PALMER,
 Defendant-appellants.
 The notice of appeal did not list the other defendant as a party to the appeal. But because the suit was an official-capacity suit against the government, the notice of appeal naming the one defendant was sufficient. Id., at 1439. Having determined that appellate jurisdiction existed over the appeal of the United States, the court did not decide whether the notice of appeal was sufficient with respect to the unnamed defendant. Id. at 1439 n. 3. Brown has no application to this case because this suit involves private defendants. Moreover, the liability implications in this case are not identical for each defendant.
 
 
 [7]
 The corporate administrator acting through an administrative committee is given the power to:
 (a) construe and interpret the Plan in accordance with uniform rules and regulations consistently applied to all Participants,
 (b) decide the eligibility of any persons to be covered under the Plan in accordance with the Plan,
 (c) determine the right of any person to a benefit, in accordance with the Plan,
 In carrying out its duties hereunder, the Committee shall have the right to request and rely upon a decision of the Board of Directors of the Company in any case where the Committee is unable to reach a decision as to what course of action to pursue.
 Plan Sec. 9.2; see also id. Sec. 9.5 (committee empowered to review and decide benefit denials).
 
 
 [8]
 29 U.S.C. Sec. 1132 provides in pertinent part:
 (a) Persons empowered to bring a civil action. A civil action may be brought--
 (1) by a participant or beneficiary--
 (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
 
 
 [9]
 Plan Sec. 7.5 provides:
 Vested Termination of Employment Benefits. An active Participant who ceases to be an Employee for any reason other than those specified in Sections 7.1 and 7.3 above shall be entitled to a distribution of 100 percent of his Participant Accounts valued as of the Valuation Date next preceding the date of cessation of his status as an Employee, increased by any salary conversion contributions attributable to him following such Valuation Date. The Participant shall be entitled to a distribution of his vested interest in his Employer Contribution Account, valued as of the Valuation Date next preceding the date of his separation from service, increased by any Employer contributions attributable to him and any adjustment of account pursuant to Section 6.4 following such Valuation Date. Such distributions shall commence in accordance with Section 8.3.
 
 
 [10]
 Plan Sec. 2.1 provides:
 "Accounts" means the Participant Accounts and Employer Contribution Account established for each Participant pursuant to Sections 6.1 and 6.2.
 
 
 [11]
 Plan Sec. 2.23 provides:
 "Trust Fund" means the fund established by the Company for the purpose of funding the Plan and into which contributions are to be made and from which benefits and expenses are to be paid in accordance with the provisions of the Plan.
 
 
 [12]
 New Sec. 6.11 provides:
 Interim Evauluation of Accounts. Each account of a Participant who terminates on a date other than a Valuation Date shall be valued currently, using the same procedure described in Section 6.3, if such interim evaluation, determined in a uniform and nondiscriminatory manner, in the opinion of the Committee is necessary to account for a material change in the fair market value of the Fund. The Committee shall determine the fair market value, based on information furnished by the Trustee and funding agent, as of the end of the calendar month next preceding the Participant's date of termination, of the net Fund in order to determine the increase or decrease in the fair market value of such Fund when compared with the fair market value of such Fund as of the next preceding Valuation Date.
 In determining the increase or decrease of the fair market value of the Fund, all dividends, declared but not yet paid, interest and other income received by the Trustee and funding agent in the interim between the next preceding Valuation Date and the interim evaluation date shall be included.
 Once the increase or decrease has been determined, the account or accounts of such Participant as of the next preceding Valuation Date shall, for purposes of distribution only, be adjusted in order to reflect such increase or decrease.
 
 
 [13]
 Amended Sec. 2.24 provides:
 "Valuation Date" means the date on which the Trust Fund shall be valued and Accounts adjusted accordingly, which date shall be the last day of each Plan Year with respect to Employer securities and the last day of each month with respect to all other securities. Valuation Date shall also include any date that an Interim Evaluation of Accounts is performed in accordance with Section 6.11.
 
 
 [14]
 The employer securities are not publicly traded and no active secondary market exists for them
 
 
 [15]
 Defendant explains that had plaintiff been paid based upon the valuation date contained in the plan, he would have received a windfall of approximately $20,000 based upon his 3% share of employer securities. Defendant then suggests that, had those holding approximately 20% of the employer securities held by the plan demanded like treatment, the plan would fail because the value of the employer securities decreased from $1.1 million on September 30, 1985 to $200,000 on January 31, 1986. Appellant's Brief at 26. This possible result is pure speculation. The plan has been amended to preclude this possibility and no record evidence suggests that any member or members holding 20% of the employer securities sought like treatment before the plan amendment. To be sure, payment of the plaintiff's share according to the plan document will represent a charge, either directly or indirectly, to member accounts. An even greater charge, however, will result when the plan also must pay the plaintiff's pre- and post-judgment interest, and attorney's fees (both sides)
 
 
 [16]
 Defendant has not argued that the valuation provision of the plan should not be enforced because it will cause the plan to fail of its essential purpose. See 29 U.S.C. Secs. 1001(b) (ERISA policy to protect "interests of participants in employee benefit plans and their beneficiaries") & 1104(a)(1)(D) (fiduciary must discharge his duties in accordance with plan documents insofar as those documents are consistent with ERISA)
 
 
 [17]
 29 U.S.C. Sec. 1110(a) provides:
 (a) Except as provided in sections 1105(b)(1) and 1105(d) of this title, any provision in any agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void as against public policy.